UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,         :
           :
      -against-        :       **OPINION & ORDER**
           :       **18-cr-561(DLI)**
KEITH WYCHE AND ONEIL ALLEN,   :
           :
        Defendants.   :
----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On February 21, 2023, after trial, a jury found both Keith Wyche ("Wyche") and Oneil Allen ("Allen") (collectively, "Defendants") guilty of one count of conspiracy to distribute and possess with intent to distribute one or more controlled substances, specifically a substance containing heroin or fentanyl or both, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) ("Count One"), one count of distribution of and possession with intent to distribute one or more controlled substances, specifically heroin or fentanyl or both, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) ("Count Two"), and one count of distribution of a controlled substance, specifically a substance containing heroin, to another, namely Sarah Wieboldt ("Wieboldt"), the use of which resulted in her serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) ("Count Four"). *See*, Superseding Indictment, Dkt. Entry No. 37; Jury Verdict, Dkt. Entry No. 226. Additionally, the jury found only Wyche guilty of one count of distribution of a controlled substance, specifically a substance containing fentanyl, to another, namely Vincent Price ("Price"), the use of which resulted in Price's death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) ("Count Three"). *See*, Superseding Indictment; Jury Verdict.

On March 21, 2023, Allen moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29") only as to his conviction under Count Four. *See*, Allen Mot., Dkt. Entry No. 228. On March 24, 2023, Wyche moved for a judgment of acquittal pursuant to

Rule 29 only as to his convictions under Counts Three and Four.  *See*, Wyche Mot., Dkt. Entry No. 229.  The Government opposed the motions.  *See*, Opp., Dkt. Entry No. 231.  Defendants each filed replies.  *See,* Allen Reply, Dkt. Entry No. 232; Wyche Reply, Dkt. Entry No. 233.  For the reasons set forth below, Defendants' motions are denied in their entirety.

## **BACKGROUND**

A jury trial took place from February 8 to February 21, 2023.  In its case in chief, the Government introduced a variety of physical and documentary evidence and called 18 witnesses, including law enforcement officers, detectives, and agents, who conducted the investigations in this case, which also involved "controlled purchases" of heroin by confidential informants; expert witnesses in the fields of forensic pathology, chemical analysis of controlled substances, drug trafficking, and cellular site ("cell-site") geolocation data analysis; a medical examiner who analyzed Price's body post mortem; a paramedic who responded to the scene of Wieboldt's overdose; Wieboldt, the overdose save victim; and Vincent Price Sr., the father of Price, the overdose death victim.  Defendants presented a case, during which they introduced one expert witness in the field of forensic pathology who testified remotely on the consent of the parties.  The Court finds the Government's witnesses credible.  In summary and relevant part, the following evidence was presented at trial.

From approximately February 2017 to September 2018, Defendants sold narcotics, including heroin and fentanyl, to paying customers throughout Staten Island.  Trial Transcript ("Tr.") at 266-69, 331-524, 729-45, 932-58.  Defendants communicated with customers to arrange purchases via a shared cell phone, the phone number for which Defendants would change periodically.  *Id*. at 737.  Communications with customers and the related drug transactions tended to follow the same pattern.  Each morning, Wyche or Allen would send text messages to customers

using their shared cell phone, letting them know they were available to sell drugs.  *Id*. at 266-68, 735.  To customers, Wyche went by the name "Marco" and Allen went by the name "James."  *Id*. at 730-32, 745.  Notably, the first text messages sent from Defendants shared cell phone each day often stated, "good morning" or "rise and shine."  *Id*. at 266-68, 735, 1299, 1314.  When customers responded to Defendants' text messages to order drugs, either Wyche or Allen would arrange to meet the customer at a specific spot, at which point customers usually entered Wyche's or Allen's vehicle and handed over money in exchange for glassines filled with substances containing heroin, fentanyl, or both.  *Id*. at 729-37.  Sometimes Allen would show up and other times Wyche would show up.  *Id*.

On the morning of April 18, 2017, Price, a 43-year-old Staten Island resident, texted a phone number in his contact list labeled as "Marco 5" to arrange a drug purchase.  *Id*. at 45, 80-81, 264-69; GX 612.  Photos of text messages found on Price's phone from that morning show that "Marco 5" asked Price "What you need," to which Price responded "2 need change only have $100's."  GX 612.  "Marco 5" responded "Ok" and then, at 9:16 am, told Price to "Come out."  Tr. at 267-69; GX 612.  Around 12:00 pm that same day, Price's father called 911 after finding Price lifeless in the bathroom in the family's home with a belt tourniquet around his right arm, a hypodermic needle nearby containing liquid that later tested positive for fentanyl, and empty glassine envelopes in the toilet.  Tr. at 47-54, 686-9; GX 632A, I, K.  First responders arrived at the scene and declared Price dead. Tr. at 54.

At trial, examiners from the Office of the Chief Medical Examiner for the City of New York ("OCME") testified about their examination of Price's body and the toxicology testing done on his blood, which showed the presence of fentanyl, cocaine, and alprazolam.  *Id*. at 829-54.; GX 404.  Experts testified about how fentanyl works and how it caused Price's death. Tr. at 829-54,

1039-68.  Additionally, cell-site location data for the "Marco 5" phone number showed that the phone had moved from Manor Heights, a neighborhood in Staten Island where 801 Manor Road, an address that would later be linked to Wyche, is located, to a different area of Staten Island where Price's home is located at the time the phone sent the 9:16 a.m. "Come out" message to Price's phone.  *Id*. at 307, 1381-89; GX 409.  After discovering the "Marco 5" phone number in Price's phone, New York City Police Department ("NYPD") investigators obtained phone records for that number and, on July 12, 2017, they surveilled one of the phone's contacts, a man named John Kane ("Kane"), who they saw exchange money for an object with the driver of a white Jeep that they later determined was registered to Wyche. Tr. at 296-300, 304-06.  Upon arresting Kane after this surveillance, the NYPD found glassines containing heroin and fentanyl in his pocket.  *Id*. at 299.

On October 27, 2017, Wieboldt, who purchased heroin from Defendants regularly by calling or texting their shared phone number, texted Defendants to arrange a heroin purchase. *Id*. at 729-44.  That same day, she went to the location that the user of the shared phone had directed her to go to, saw Wyche in a white Jeep, entered the Jeep, and received heroin in exchange for cash.  *Id*. at 744-45.  After leaving the Jeep, she snorted the heroin she just had purchased and suffered an overdose.  *Id*. at 745-46.  First responders called to the scene administered Narcan, an anti-opiate medication, and revived her.  *Id*. at 744-46, 1003-1118; GXs 405, 406.  Cell-site location data for the phone Wieboldt had texted to arrange the purchase that day showed the phone connected to a cell tower near 801 Manor Road at the time it was communicating with Wieboldt's phone and later showed the phone in the vicinity of where Wieboldt said she purchased the heroin from Wyche.  Tr. at 1391-94, 1397-99; GX 409.  Notably, at trial, Wieboldt testified that it was Wyche who sold her the heroin on which she overdosed that day and that she knew Wyche as

"Marco" and Allen as "James." Tr. at 730-32, 745.  She also testified that she knew Wyche and Allen to work as a pair in that they shared the phone number that she would contact to arrange drug purchases, and that both Wyche and Allen sent messages frequently using the phrases "Rise and Shine" and "Good Morning" to her phone.  *Id*. at 735.  Photographs of her text messages with Defendants' shared phone number that were admitted at trial corroborated this testimony. GX 613A-K.

After Wieboldt's overdose, NYPD detectives arranged a series of controlled buys with three confidential informants ("CIs"), including Wieboldt.  Tr. at 331-69, 376-80, 393-403, 415-19, 431-35, 459-62, 480-84, 508-12, 523-24, 932-58, 934.  The controlled buys, which took place from approximately November 2017 through August 2018, were executed while NYPD detectives observed from afar.  *See e.g., Id*. at 324-26, 331, 335, 395, 432, 523.  At trial, the detectives testified about these controlled buys, during which they observed both Wyche and Allen sell drugs to several CIs.  *See e.g., Id*. at 331-44, 415-19, 431-35, 459-62, 480-84, 934-47.  These controlled buys followed the same general pattern as that testified to by Wieboldt.  *Id*. at 324-28.

Upon receiving cellphone text messages from the supplier, the CIs would tell the detectives where the sales were to occur and the detectives would position themselves to see the sales take place.  *Id*. at 324-26, 335.  Before a sale, the detective searched the CI to make sure the CI did not bring any drugs or money with him/her, ensured the CI was not intoxicated, provided the CI with money, and then observed as the CI met with either Wyche or Allen to make a purchase.  *Id*. at 324-327 (describing how confidential informant purchases are conducted).  After making the purchase, the CI would return to the detectives and provide the substances obtained from the purchase.  *Id*. at 327-28.  The substances then were vouchered and sent to the NYPD Police Laboratory for testing, which confirmed each time that the item contained heroin, fentanyl, or both.

GXs 102, 303-319.  During these controlled buys, the detectives were able to see the Defendants, the license plates of cars they drove, or both.  *See e.g*., Tr. at 334-35, 359.  Wyche ordinarily drove a white Jeep, the same white Jeep Wieboldt entered on October 27, 2017, and Allen drove an Infiniti or Lexus.  *Id*. at 334-35, 341, 358-59, 368, 378, 395, 401.  New York State Department of Motor Vehicle ("DMV") records introduced at trial confirmed that the Jeep was registered in Wyche's name and the Lexus was registered in Allen's name.  *Id*. at 306-07, 404-05; GXs 402, 403.  Through surveillance on Defendants and GPS tracking on Defendants' vehicles, on numerous occasions, law enforcement observed Defendants and the aforementioned Jeep, Lexus, and Infiniti return to an apartment located at 1 John F. Kennedy Boulevard in Somerset, New Jersey ("1 JFK Boulevard").  Tr. at 435-40, 443-44, 451-53, 1189-1203.

On September 18, 2018, law enforcement agents arrested Defendants. *Id.* at 248.  Pursuant to court issued search warrants, searches were conducted at 801 Manor Road and at 1 JFK Boulevard.  *Id.* at 1204.  At 1 JFK Boulevard, law enforcement agents recovered drug paraphernalia, stacks of cash, boxes of glassine envelopes, and other equipment indicative of drug trafficking.  *Id.* at 1134-1139, 1148-1159; GXs 603A-EE.  They also recovered a note on which Price's name and phone number were written, along with the name and phone number for other individuals.  Tr. at 1154-55; GXs 328, 603BB.  At 801 Manor Road, law enforcement recovered several cell phones found in the same drawer as identification belonging to Wyche and the title to Wyche's white Jeep.  Tr. at 1165-79.  The recovered cell phones contained text message conversations related to narcotics sales, including text messages to phone numbers linked to Kane and Price, and contact information for Wieboldt and other customers that matched contact information listed on the piece of paper recovered at 1 JFK Boulevard. *Id.* at 1294-95, 1154-55, 1299, 1304-08, 1310-17, 1320-23; GXs 203A, 204A.  Notably, the cell phones also contained text

messages with phrases such as "Rise and shine" that used identical language to text messages sent to Price's phone from the "Marco 5" phone number.  Tr. at 266-68, 1299, 1314-1; GXs 203A, 204A, 612.

On February 21, 2023, the jury returned a guilty verdict as to both Defendants on all counts. *See,* Jury Verdict.  On March 21, 2023 and March 24, 2023, Allen and Wyche, respectively, filed the instant Rule 29 motions.  *See*, Allen Mot.; Wyche Mot.  Allen challenges his conviction under Count Four for distribution of heroin resulting in Wieboldt's serious bodily injury.  *See*, Allen Mot.  Wyche challenges his convictions under Count Three for distribution of fentanyl resulting in Price's death and Count Four for distribution of heroin resulting in Wieboldt's serious bodily injury.  *See*, Wyche Mot.

## LEGAL STANDARD

A defendant may move for a judgment of acquittal on the ground that the trial evidence was insufficient as a matter of law to support the jury's guilty verdict.  *See*, Fed. R. Crim. P. 29 ("Rule 29").  Rule 29 "imposes a heavy burden on the defendant, whose conviction must be affirmed 'if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted)).  For a defendant to succeed on its motion, the Court must find that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Bramer*, 956 F.3d 91, 97 (2d Cir. 2020) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).  A court's conclusion that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt[]" must be based on its consideration of "all of the evidence, direct and circumstantial[.]"  *United States v.*

*Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citation omitted).

The court may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Cote*, 544 F.3d at 99 (internal punctuation and citations omitted).  Instead, the court must give "full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the Government." *Id.*; *See also*, *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.") (quoting *Eppolito*, 543 F.3d at 45).  In other words, the court must view the evidence "in the light most favorable to the Government[,]" which means "crediting every inference that the jury might have drawn in favor of the Government, and recognizing that the Government's evidence need not exclude every other possible hypothesis." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks and citations omitted).  However, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (emphasis omitted).

## DISCUSSION

## I.    Count Three: Distribution of Fentanyl Resulting in Vincent Price's Death

Wyche challenges the sufficiency of the evidence supporting his conviction under Count Three for distribution of fentanyl resulting in Price's death.  Wyche Mot. at 7-12.  To establish Wyche's guilt under Count Three, the Government was required to prove beyond a reasonable doubt that: (1) Wyche distributed a controlled substance containing fentanyl to Price on or about April 18, 2017; (2) Wyche distributed the controlled substance containing fentanyl knowingly and intentionally; and (3) the controlled substance containing fentanyl that Wyche distributed resulted in Price's death.  *See,* Jury Charge, Dkt. Entry No. 220, at 42-43.

In his motion, Wyche argues the Government failed to submit sufficient evidence at trial for a reasonable jury to conclude that: (1) he distributed fentanyl to Price on April 18, 2017; and (2) Price's use of that fentanyl resulted in his death.  Wyche Mot. at 7-12.  The Government asserts that it presented more than sufficient evidence at trial to sustain Wyche's conviction as to this count.  Opp. at 11-16.  For the reasons set forth below, the Court finds the Government presented sufficient evidence at trial for a reasonable jury to conclude that: (1) Wyche distributed fentanyl to Price on April 18, 2017 and (2) Price's use of that fentanyl resulted in his death.  Accordingly, Wyche's Rule 29 motion as to this count is denied.

### A.    Distribution of Fentanyl to Vincent Price on April 18, 2017

Wyche argues that no reasonable jury could conclude that he distributed fentanyl to Price on April 18, 2017 because the Government presented no evidence to establish that: (1) Wyche had any connection to the phone number labeled "Marco 5" in Price's phone that Price had texted to purchase narcotics on April 18, 2017 or (2) that the person using the "Marco 5" phone number on April 18, 2017 sold Price the fentanyl he injected that day.  Wyche Mot. at 2-3, 7-9.  However, Wyche's arguments disregard a significant amount of evidence and testimony admitted at trial from which a reasonable jury could have found, and did find, that the Government had proven both of these points beyond a reasonable doubt.

The Government presented documentary evidence and testimony from multiple witnesses connecting Wyche to the "Marco 5" phone number and establishing his identity as the user of that phone on the morning of Price's death beyond a reasonable doubt.  *See*, Opp. at 11-12.  Cell-site location data introduced at trial showed that, at the time the "Marco 5" phone was used to send the message to Price's phone saying, "Come out," the phone had been moved from the neighborhood where Wyche's 801 Manor Road residence is located to the area where Price's home is located

and then returned to the Manor Heights neighborhood thereafter.  Tr. at 1381-91; GXs 408, 409, 612.

The Government also introduced into evidence a note recovered from 1 JFK Boulevard that had Price's name and phone number written on it as well as a cell phone extraction report showing that a phone recovered at 801 Manor Road had been used to send text messages to Price's phone.  Tr. at 1154-55, 1311, 1314-17; GXs 204A, 603BB.

The Government also introduced evidence showing that the "Marco 5" phone number had been used to send text messages to Price's phone prior to April 18, 2017 using language that matched the language found in text messages on other phones seized from Wyche's 801 Manor Road residence.  Tr. at 266-68, 1294-95, 1299, 1304-08; GXs 612, 203A, 205.

Wieboldt testified that she knew Wyche as "Marco" and both he and Allen sent her text messages using the same language that was used in text messages sent to Price's phone from the "Marco 5" phone number and was found in text messages on the phone seized at 801 Manor Road.[1] Tr. at 731-32, 745, 1294-95; GXs 203A, 612-13.

One of the lead NYPD detectives who investigated Defendants testified that, in conducting surveillance of Kane, who was one of the contacts found in the "Marco 5" phone after Price's death, he observed Kane meet with an individual in the white Jeep registered to Wyche.  Tr. at 296-300, 304-06.

Wyche argues there was proof at trial that, in the hours leading up to Price's death, Wyche used "two other phones, neither of which had any calls or text messages with [ ] Price's telephone number" or were "proved [to be] in the vicinity of [ ] Price's home that day[.]"  Wyche Br. at 3, 8

---

[1] The parties stipulated that Allen was not capable of drug distribution between March 20, 2017 and July 6, 2017, which eliminated Allen as a potential user of the "Marco 5" phone on April 18, 2017, the day of Price's overdose. GX 104.

(citing GXs 203A, 204A). However, as Wyche acknowledges in his papers, "[n]o evidence was produced as to where those phones were located that morning[.]"  *Id.* at 3.  Thus, this evidence is insufficient to negate the reasonableness of the inferences that the jury drew, or was permitted to draw, in finding that, based on the totality of the evidence presented at trial, Wyche was the user of the "Marco 5" phone the morning of Price's death.  Indeed, a reasonable jury could have found that evidence of these two other phones had no bearing on whether Wyche also was using the "Marco 5" phone number the morning of Price's death.  Moreover, as Wyche concedes, Price also was listed "as a contact in those [two other] phones" and, on other occasions, at least one of those phones had been used to send text messages to Price's phone.  *Id.* at 3 (citing to GXs 203, 203A, 204, 204A) (stating that Defendants "admittedly had [Price] as a contact in those phones [that were associated with Defendants] and on a list of individuals recovered during the execution of a search warrant"); Tr. at 1314-17, 1154-55.

Wyche unpersuasively contends that there was no proof that he "was ever known as 'Marco 5' or who the other four Marcos might have been."  Wyche Br. at 7-8.  Indeed, "the Government need not negate every theory of innocence."  *See, United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (internal quotation marks and citations omitted).  Notably, Wyche even concedes that "there was proof that he used the name 'Marco.'"  *Id.* at 7-8.

Lastly, Wyche contends that the evidence at trial was insufficient to prove that the user of the "Marco 5" phone sold Price the fentanyl on the morning of his death.  Wyche Br. at 2. However, as the Government notes, "there were no other communications recovered on Price's phone from that day that were indicative of narcotics sales" and, while Wyche asserts that this point "is not dispositive in that that phone was not recovered by law enforcement until long after April 18, 2017 having been in the custody of Mr. Price's family," that is an issue for the jury to

decide, not this Court.  *See,* Opp. at 12; Wyche Reply at 3; *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006) (explaining that courts "defer to the jury's determination of the weight of the evidence").

Significantly, the Government's drug trafficking expert testified that, when Price texted the "Marco 5" phone saying, "2 need change only have $100's," he was asking for two bundles of narcotics.  Opp. at 2; Tr. at 267-69, 1449-50.  The Government also presented evidence that the two bundles contemplated in the text exchange were recovered at the scene of Price's death and were "held together by black rubber bands consistent with those that were recovered following numerous CI buys from [D]efendants." Opp. at 12 (citing Tr. 337, 339, 345, 362, 366, 370 and GX 632L).  Therefore, the evidence Wyche points to suggests nothing more than the possible existence of competing inferences that might have been drawn from the evidence presented at trial, none of which are dispositive because "[a] court must defer . . . to the jury's choice of the competing inferences that can be drawn from the evidence." *Landesman*, 17 F.4th at 320 (internal quotation marks and citations omitted); *See*, Wyche Br. at 3-4, 8.  For example, Wyche's argument that, at times, he sold drugs to law enforcement informants wrapped in rubber bands that were not black, goes to the weight of the evidence and it is up to the jury to choose from and reconcile competing inferences that may be drawn reasonably from the evidence.  *See,* Wyche Reply at 3; *Landesman*, 17 F.4th at 320.

Accordingly, the Government produced sufficient evidence at trial for a reasonable jury to draw the inferences that the instant jury did in finding beyond a reasonable doubt that Wyche was using the "Marco 5" phone on the morning of April 18, 2017 and that Wyche, as the user of that phone, distributed the fentanyl to Price that he injected later that morning.

**B.**     **"But For" Cause of Vincent Price's Death on April 18, 2017**

Wyche argues that, even if the Government established that he supplied fentanyl to Price on April 18, 2018, his conviction as to Count Three should be overturned because, as a matter of law,  the Government failed to produce evidence sufficient to establish that Price's ingestion of the fentanyl resulted in his death.  Wyche Br. at 9-12.  Wyche points to the fact that the cause of death stated on Price's death certificate is "[a]cute intoxication due to the *combined effects* of cocaine, fentanyl, and alprazolam" and to trial testimony from the Government's and Defendants' forensic pathology experts acknowledging this finding.  *Id*. at 4 (citing Tr. 854, 1059-60)(emphasis in original); GX 404.  Specifically, Wyche argues that, under the Supreme Court's interpretation of the causation requirement set forth in *Burrage v. United States*, this evidence precludes a finding that fentanyl was the "but for" cause of his death.  *See,* Wyche Br. at 9-12; *Burrage v. United States,* 571 U.S. 204 (2014).  However, Wyche's arguments ignore the law on causation and other evidence presented at trial regarding the temporal sequence in which Price consumed the drugs detected in his system at death, the quantities of the drugs detected, and their effects.

In *Burrage*, the Supreme Court held that, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under [21 U.S.C. § 841(b)(1)(C)] . . . unless such use is a but-for cause of the death or injury." 571 U.S. at 218-19.  In so holding, the Supreme Court explained that an act is a "but for" cause of death when it "combines with other factors to produce the result, so long as the other factors alone would not have done so."  *Id.* at 211.  Indeed, in interpreting *Burrage*, the Second Circuit confirmed that the narcotics distributed need only be "a but-for cause of the death," not the "sole cause."  *United States v. Sica*, 676 F. App'x 81, 83-84 (2d Cir. 2017) (summary order).  In so holding, the Second Circuit pointed to the fact that "*Burrage* distinguished

between instances in which the defendant's narcotics trafficking 'merely played a nonessential contributing role' in the death, which does not suffice to establish causation, and instances in which the 'incremental effect' of the drugs was the 'straw that broke the camel's back,' which does suffice." *Sica*, 676 F. App'x at 84 (quoting *Burrage*, 571 U.S. at 211-12).

Here, the Government presented evidence at trial sufficient for the jury to find beyond a reasonable doubt that, while Price had fentanyl, cocaine, and alprazolam in his system at the time he died, the fentanyl he injected that morning was "the straw that broke the camel's back" and caused his death, thus satisfying the *Burrage* standard. *See, Burrage*, 571 U.S. at 211. The Government presented testimony and documents establishing, *inter alia*, that Price was alive in the early morning of April 18, 2017 and, at some time after 9:16 am, Price's father found him dead in the bathroom of the family's home with a makeshift tourniquet around his right arm, puncture wounds on his right arm indicative of injection sites, empty glassine envelopes in the toilet beneath him, and a hypodermic needle next to him containing fentanyl. Tr. at 48, 50-54, 665, 668, 686-91, 838-39; GXs 205, 205A-B, 404, 612, 632A, 635I, 632K.

The Government also elicited testimony from several experts in the fields of chemical analysis and forensic pathology, including from Defendants' own expert, who testified about fentanyl's marked potency relative to other drugs and the almost immediate effect a drug, especially one as potent as fentanyl, can have on the body when injected intravenously. *See,* Tr. at 673, 710, 829, 853-54, 1030-31, 1042, 1046-07, 1559, 1571-73. Significantly, the Government elicited expert testimony from Dr. Melissa Pasquale-Styles ("Dr. Pasquale-Styles"), a deputy chief medical examiner at the Office of the City Medical Examiner ("OCME"), who testified that, in her expert opinion, Price took "a terminal shot of fentanyl . . . that put[ ] him over the edge and caused his death." *Id*. at 1052. To support this opinion, Dr. Pasquale-Styles testified that: (1) according

14

to the toxicology testing done on Price's blood, ethylbenzoylecgonine, a substance that forms in the presence of cocaine and alcohol, was present in his system, but alcohol was not; (2) such results indicate that Price was alive with cocaine and alcohol in his system long enough for his liver to produce ethylbenzoylecgonine and stayed alive long enough for his body to metabolize off all the alcohol; and (3) notably, norfentanyl, which forms when fentanyl is metabolized, was not detected in his system, whereas fentanyl was, thus indicating that Price had ingested fentanyl, but died before his body could begin metabolizing it.  *Id.* at 1039-40, 1045-46; GX 404.

Accordingly, Dr. Pasquale-Styles opined that Price remained alive with the cocaine and alcohol in his system, but died upon "tack[in] a terminal shot of fentanyl . . . that put[ ] him over the edge and caused his death."  Tr. at 1052.  She further testified that: (1) the quantity of alprazolam in Price's blood alone would not have been toxic or lethal; and (2) the quantity of fentanyl in Price's blood alone could have been sufficient to cause his death.  *Id.* at 1041, 1047, 1-67-68.  From such evidence, a reasonable jury, crediting the Government's expert testimony, as it may, could have inferred that the fentanyl injection put Price "over the edge" and caused his death.  *See, Cote*, 544 F.3d at 99 (explaining that the court must give "full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the Government").

Wyche argues that the expert testimony here is not greater than the testimony found insufficient in *Burrage*.  *See,* Wyche Br. at 11-12.  He asserts that none of the Government's experts could say that "fentanyl alone, by itself, was the cause of []Price's death."  *Id.* at 4.  However, this assertion ignores both the credible evidence presented at trial and the fact that, under the standard established in *Burrage*, a finding that a combination of drugs contributed to a death does not preclude the possibility of a finding that one of those drugs was a "but for" cause of the death or "the straw that broke the camel's back."  *See, Burrage*, 571 U.S. at 211, 219 (discussing

example where "if poison is administered to a man debilitated by multiple diseases, it is a "but for" cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived").

Wyche further argues that other expert testimony established that either the cocaine alone or the cocaine plus the alprazolam in Price's system could have sufficed to kill him and that, without an autopsy, which was not performed at the family's request, no witness could conclude that Price, in fact, died as a result of ingesting the fentanyl.  *See,* Wyche Br. at 4, 11; Tr. at 865-66, 1061-64, 1068-69, 1561-62.  However, Defendant ignores other expert testimony presented at trial that could support a reasonable inference that Price would not have died but for the shot of fentanyl he injected that morning. *See*, Tr. at 1041-52.  As there is evidence that reasonably could support the jury's verdict, Wyche's argument on this point asks the Court to intrude impermissibly on the jury's province, usurp its role,  and disturb a credibility assessment that the jury was entitled to, and did, make.  *See, Reifler*, 446 F.3d at  94 (courts "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence") (internal quotation marks and citation omitted).

Thus, the Government produced evidence at trial sufficient for a reasonable jury to conclude beyond a reasonable doubt that Price's use of the fentanyl that Wyche distributed resulted in his death.  Accordingly, Wyche's Rule 29 motion as to Count Three is denied.

## II.    Count Four: Distribution of Heroin Resulting in Serious Bodily Injury to Sarah Wieboldt

Both Defendants challenge the sufficiency of the evidence supporting their respective convictions under Count Four for distribution of heroin resulting in serious bodily injury to Wieboldt.  *See,* Allen Br. at 1-4; Wyche Br. at 12-14.  To establish a defendant's guilt under Count Four, the Government was required to prove beyond a reasonable doubt that: (1) the defendants

16

distributed a controlled substance containing heroin to Wieboldt on or about October 27, 2017; (2) the defendants distributed the controlled substance containing heroin knowingly and intentionally; and (3) the controlled substance containing heroin that the defendants distributed resulted Wieboldt's serious bodily injury. *See,* Jury Charge at 43-45. With respect to this count, the Government argued that Allen was guilty on a theory of aiding and abetting. *See* 18 U.S.C. § 2; Tr. at 1607-09; Opp. at 19-24. To establish Allen's guilt under Count Four on an aiding and abetting theory, the Government was required to prove beyond a reasonable doubt that: (1) Wyche committed the crime charged in Count Four; and (2) Allen aided or abetted Wyche in the commission of that crime. Jury Charge at 46-48.

Wyche contends that the Government failed to submit sufficient evidence for a reasonable jury to conclude that: (1) he distributed heroin to Wieboldt on October 27, 2017; and (2) Wieboldt's use of that heroin resulted in serious bodily injury to her. Wyche Br. at 12-14. Allen argues that the Government failed to submit sufficient evidence for a reasonable jury to conclude that: (1) he aided and abetted Wyche's distribution of heroin to Wieboldt on October 27, 2017; and (2) Wieboldt's use of that heroin resulted in serious bodily injury to her. Allen Br. at 2-4. The Government asserts that it presented more than sufficient evidence at trial to sustain both Wyche's and Allen's respective convictions on this charge, including under an aiding and abetting theory as to Allen. Opp. at 16-26.

For the reasons set forth below, the Court finds the Government presented evidence at trial sufficient for a reasonable jury to find beyond a reasonable doubt that: (1) Wyche distributed heroin to Sarah Wieboldt on October 27, 2017; (2) Allen aided and abetted that heroin distribution; and (3) Wieboldt's use of that heroin resulted in serious bodily injury to her. Accordingly, Defendants' Rule 29 motions as to Count Four is denied.

### A.      Distribution of Heroin to Sarah Wieboldt on October 27, 2017

Wyche maintains that the Government "did not establish beyond a reasonable doubt that the substance which Ms. W[ie]boldt ingested was, in fact, heroin as the Government charged" as opposed to "some other opioid controlled substance." Wyche Br. at 13. Specifically, Wyche bases his assertion on the fact that no laboratory testing was done on the bags of heroin Wieboldt allegedly purchased from Wyche that day. *Id.* (citing Tr. at 228-29 and GX 405).

However, "a defendant may be convicted of narcotics possession if some evidence—direct, circumstantial, or otherwise—establishes the defendant's possession of the illegal substance." *United States v. Bryce*, 208 F.3d 346, 353 (2d Cir. 1999). Indeed, "'[l]ay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction.'" *Id.* (quoting *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976)). Moreover, the Second Circuit explicitly has held that the testimony of "habitual" drug users suffices to support a jury's finding as to a substance's identity beyond a reasonable doubt. *See, United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir. 2003).

Under this standard, the Government presented sufficient evidence for a jury to find that Wyche sold heroin to Wieboldt on October 27, 2017 beyond a reasonable doubt. For example, Wieboldt testified at trial that she was a habitual drug user with a heroin addiction and, based on her personal experience, she explained that "heroin itself looks similar to sand or like a brown sugar powder and it generally comes in small bags." Tr. at 719, 721. She also testified that the substance she purchased from Wyche on October 27, 2017 was a "light brown, sand-ish color," that "looked like it always looked," like a "typical bag" of heroin she would purchase from Defendants, and, upon snorting it, she felt "very high." *Id.* at 745-46. Testimony from the

Government's expert witness in the field of drug trafficking characteristics similarly described heroin as "tannish in color, lightish brown." *Id.* at 1440-41.  Moreover, several other witnesses provided corroborative testimony, including, for example, testimony that first responders were called to the scene, administered Narcan, an anti-opiate medication, and revived Wieboldt.  *Id.* at 744-46, 1003-1118; GXs 405, 406.

### B.      Aider and Abettor Liability

Allen argues that the Government presented insufficient evidence at trial to support the jury's finding that he aided and abetted Wyche's October 27, 2017 heroin distribution to Wieboldt. Allen Br. at 2-3.  The Government counters that the evidence at trial was more than sufficient to establish Allen's liability as to Count Four under an aiding and abetting theory considering the evidence at trial establishing Defendants' ongoing narcotics conspiracy, the convictions for which Defendants do not challenge, and their connections to Wieboldt.  Opp. at 19-24.  Specifically, the Government asserts that Allen's argument improperly focuses on the lack of direct evidence linking Allen to the October 27 sale to Wieboldt and ignores well established case law holding that his conviction under an aiding and abetting theory may be supported entirely by circumstantial evidence.  *Id.* at 23-24 (citing *United States v. Johnson*, 861 F. App'x. 483, 489 (2d Cir. 2021) (summary order)).

Liability under an aiding and abetting theory requires that a defendant "(1) take an affirmative act in furtherance of [an] offense, (2) with the intent of facilitating the offense's commission."  *Rosemond v. United States*, 572 U.S. 65, 71 (2014) (citation omitted). Correspondingly, the jury was instructed that, to establish that Allen aided and abetted Wyche's commission of the crime charged in Count Four, the Government was required to prove beyond a reasonable doubt that: (1) Allen "knowingly associated himself in some way with the crime," *i.e.,*

that he "knew that a controlled substance containing heroin was distributed to Sarah Wieboldt, the use of which resulted in seriously bodily injury to her"; and (2) Allen "participated in the crime by doing some act to help make the crime succeed," *i.e.*, he "engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime." *See,* Jury Charge at 46-48.

Notably, "[t]o prove that the defendant acted with [the] specific intent [to aid and abet a crime], the Government must show that he knew of the crime, but it need not show that he knew all of the details of the crime, so long as the evidence shows that he joined the venture, [that he] shared in it, and that his efforts contributed towards its success." *Reifler*, 446 F.3d at 96 (internal quotation marks and citations omitted); *See, Rosemond*, 572 U.S. at 77 ("So for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission"). Furthermore, it is well established that evidence of a defendant's intent to aid and abet a crime may be circumstantial. *United States v. Heras*, 609 F.3d 101, 106 (2d Cir. 2010). Indeed, courts have found that, from evidence of an "ongoing narcotics conspiracy," a jury "could reasonably" find that a defendant knew of a co-conspirator's crime and acted with intent to contribute to it for purposes of establishing aider and abettor liability. *United States v. Brown*, 2009 WL 2045378, at *12 (E.D.N.Y. July 9, 2009). A defendant need not have "personally carried out" the crime. *Rosemond*, 572 U.S. at 70.

Over the course of its case in chief, the Government introduced voluminous evidence of Defendants' ongoing conspiracy to distribute or possess with the intent to distribute heroin and fentanyl between February 2017 and September 2018, the convictions for which Defendants do not challenge, as well as evidence of Defendants' connection both to each other and to Wieboldt. From this evidence a jury reasonably could have inferred that Allen: (1) knowingly associated himself with Wyche's heroin distribution to Wieboldt on October 27, 2017, which took place

20

during the period of the ongoing conspiracy; and (2) took affirmative action with intent to facilitate that distribution.  *See,* Opp. at 19-20.

The Government maintains that evidence of Defendants' shared cellphones, which they used to arrange narcotics sales to customers as part of their drug distribution venture, could support an inference that Allen "would have had to have directly arranged the sale to Sarah Wieboldt on October 27, 2017 or would have had to give[ ] (sic) the cellphone to Wyche, knowing that Wyche would use it to arrange drug sales." *Id*, at 23.  Further supporting this inference, Wieboldt testified, *inter alia,* that: (1) she began purchasing heroin from Defendants in the summer of 2017; (2) she contacted both Defendants at one phone number; (3) sometimes Allen met her to make the heroin sale and at other times Wyche did; and (4) on the day of her overdose, she contacted Defendants' shared number and it was Wyche who met her that day to make the sale.  *Id*. at 21; Tr. at 730-35, 740-45.  Evidence at trial also linked Allen to Wieboldt in the context of Defendants' joint venture. For example, the evidence showed that Defendants' shared cell phone number was saved in Wieboldt's phone as "James," which was Allen's alias, and the phone Wieboldt contacted on the day of her overdose was located in the vicinity of a narcotics sale that Allen made to a CI a few days later.  Opp. at 6; Tr. at 331-34, 750-51, 1398-99; GXs 409, 613.

The Government further argues that evidence establishing the use of Allen's residence at 1 JFK Boulevard as a place where Defendants stored and packaged drugs for sale could support an inference that "Allen either assisted in the packaging of the heroin distributed . . . or . . . allowed Wyche to use the residence to package the heroin for sale."  Opp. at 23; *See,* Tr. at 1134-1139, 1148-1159 (the search of 1 JFK Boulevard uncovered drug paraphernalia, stacks of cash, and other equipment indicative of drug trafficking); *United States v. Willis,* 14 F.4th 170, 183-84 (2d Cir. 2021) (finding evidence sufficient for reasonable jury to conclude that defendant aided and abetted

co-conspirator's possession of cocaine with intent to distribute where evidence suggested that defendant "aided in the commission of the crime by maintaining a stash house" that contained "tools of the trade found exclusively" therein).

Allen contends that the evidence at trial shows that Wyche "alone" arranged and consummated the sale to Wieboldt on October 27, 2017 and there was no proof he contributed to the sale, performed an act to further the sale, shared in the intent to make the sale, or was even aware that Wieboldt sought to buy drugs that day or that the sale occurred that day. Allen Br. at 2-3; Allen Reply at 2. Allen further contends that the Government only cites to "proof relevant to Allen's guilt of other counts that he is not contesting on Rule 29 grounds: drug conspiracy between February 2017 and September 2018 under count one, or distribution or possession with intent to distribute controlled substances over the same 20-month period under count two." Allen Reply at 2.

However, as discussed above, "a defendant need not know all of the details of a criminal scheme" or have "personally carried out" the crime to be guilty of aiding and abetting and the evidence supporting such liability may be circumstantial. *See, Rosemond*, 572 U.S. at 70; *See also, Heras*, 609 F.3d at 108 (collecting cases) (finding liability as aider and abettor of co-defendant's attempt to possess drugs with intent to distribute on January 25, 2009 despite the fact that "no evidence was introduced at trial indicating that [the defendant] knew the particulars of [his co-defendant's] distribution plan for any drugs acquired on January 25, 2009" because the defendant knew his co-defendant "was a drug dealer and that he was traveling…to take possession of a quantity of drugs," which could permit reasonable jury to find he knew the goal was to distribute drugs, and made efforts to facilitate that possession). Additionally, Allen's argument that Wyche "alone" arranged and consummated the sale to Wieboldt ignores evidence from which the jury

reasonably could have inferred, *inter alia*, that Allen provided to Wyche the drugs sold to Wieboldt, the cell phone used in completing the sale to her, or both.  *See, Heras*, 609 F.3d at 109 (citing *United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury."))

Moreover, the jury is allowed to consider and infer from evidence of the "ongoing narcotics conspiracy" that Allen knew of Wyche's crime and acted with intent to contribute to it.  *See*, *Brown*, 2009 WL 2045378, at *12.  "[I]t could reasonably be inferred that a defendant's continued participation in a criminal enterprise aided and abetted a coconspirator's subsequent crime" where evidence established that the defendant's association with the conspiracy "predated the commission of the substantive crime the defendant was convicted of aiding and abetting." *United States v. Ledezma*, 26 F.3d 636, 641-42 (6th Cir. 1994)   Accordingly, the Government presented sufficient evidence at trial for a reasonable jury to conclude beyond a reasonable doubt that Allen had the requisite knowledge of Wyche's distribution to Wieboldt and acted to further it.

### C.    "But For" Cause of Sarah Wieboldt's Serious Bodily Injury

Defendants also argue that, even if the Government presented evidence sufficient for a reasonable jury to find Wieboldt ingested heroin Defendants sold to her, their convictions on Count Four should be overturned because the Government did not present evidence sufficient to establish that the heroin she ingested caused her serious bodily injury.  Allen Br. at 3-4; Wyche Br. at 13-14.  As discussed above in connection with Count Three, to establish causation, the Government was required to establish beyond a reasonable doubt that the heroin distributed was a "but for" cause of Wieboldt's injury, *i.e.*, that but for Wieboldt's ingestion of heroin, she would not have suffered a serious bodily injury.  While the ingestion of the drug need not be the sole cause, it must be more than a "contributing cause."  *See, Burrage,* 571 U.S. at 208, 211-12, 215-19.

Defendants contend that the evidence of causation is legally insufficient to sustain the jury's finding that the heroin Defendants distributed to Wieboldt caused her overdose because: (1) after overdosing, Wieboldt left the hospital before any toxicology testing was done on her blood and, thus, there is "no evidence as to what drugs were in her system;" (2) while the Government did not present expert testimony on the causation element of Count Four, Defendants did present an expert who testified that, without such toxicological testing to indicate what other drugs were in Wieboldt's system, he could not say with a reasonable degree of medical certainty what caused Wieboldt's overdose; and (3) as Defendants' expert also testified, and as the Government's paramedic witness confirmed, Narcan works on a broad range of opiates, not only heroin and, thus, while Wieboldt's revival by Narcan admittedly indicates that "it was probable that she overdosed from one or more opiates," it does not establish that she ingested or overdosed on heroin only. Allen Br. at 3-4 (citing Tr. at 1019-20, 1564); Wyche Br. at 5, 13-14.

As an initial matter, and as Allen concedes, the law on causation does not require that the substance Wieboldt ingested be the "sole cause" of her injury nor have Defendants provided authority to support their contention that a toxicology report is required to establish causation. Allen Reply at 3; *See, Hawkins v. United States*, 2021 WL 3501375, at *9 (S.D.N.Y. Apr. 20, 2021) (noting that an argument that "§ 841(b)(1)(C) did not apply unless the heroin and fentanyl…sold…were the sole cause of [the victim's] death" was "defeated by *Burrage*[.]") (citing *Sica,* 676 F. App'x at 83-84); *United States v. Lee*, 660 F. App'x. 8, 15 (2d Cir. 2016) (explaining that "[n]o particular type of evidence is required" for the jury to reach its verdict).

Thus, the Government's evidence need not have established that Wieboldt ingested *only* heroin on the day of her overdose and Defendants' expert testimony that, without toxicological testing to determine what drugs were in Wieboldt's system, he could not state to a reasonable

degree of medical certainty what caused Wieboldt's overdose is not dispositive.  *See,* Tr. at 1564.  Furthermore, Allen's assertion that the Government presented "no evidence as to what drugs were in [Wieboldt's] system" is belied by the evidence the Government presented at trial, which the jury was entitled to rely on.  This included Wieboldt's testimony recounting events leading up to her overdose and the fact that she had not ingested other drugs before ingesting the heroin she purchased on October 27 as well as hospital records and reports prepared by first responders documenting that Narcan revived Wieboldt.  Allen Br. at 3; Opp. at 25 (citing GX 405-06).

Specifically, Wieboldt testified that, on the day of the overdose, she went with a friend to purchase heroin from Wyche, immediately "did the heroin" after purchasing it from Wyche, felt "very high," and then woke up in an ambulance after first responders revived her with Narcan.  Tr. 744-46.  Significantly, she also testified that she had not ingested any other drugs the night before or the morning of her overdose.  Tr. 784.  Taken together, this evidence is sufficient for a reasonable jury to find beyond a reasonable doubt that the heroin Defendants distributed caused Wieboldt's overdose.  Indeed, the jury's verdict need not be based on any particular type of evidence "so long as the evidence taken together is such that a 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Lee*, 660 F. App'x. at 15 (quoting *Persico*, 645 F.3d at 105).

The analysis of the evidence and testimony that Defendants rely on in their argument here consists entirely of credibility assessments, judgment calls, and logical inferences that the jury made in reaching its decision, which the Court must defer to for purposes of Defendants' Rule 29 motions.  Notably, it does not take into account the totality of the evidence presented in the case.  Accordingly, Defendants' Rule 29 motions as to Count Four are denied.

## **CONCLUSION**

For the reasons set forth above, Defendants' motions for judgments of acquittal are denied

in their entirety.

SO ORDERED.

Dated: Brooklyn, New York
      October 19, 2023

/s/
_____
DORA L. IRIZARRY
United States District Judge
